**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**AT COVINGTON**

**CRIMINAL ACTION NO. 05-24-DLB**

**UNITED STATES OF AMERICA**                                              **PLAINTIFF**

**vs.**                          **MEMORANDUM OPINION & ORDER**

**OLUYEMISI MUINAT LAWSON**                                        **DEFENDANT**

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

This matter is before the Court on Defendant's Motion to Suppress. (Doc. #13) The United States filed its response to the motion. (Doc. #14) An evidentiary hearing was held on April 28, 2005. Defendant was present for the hearing and represented by Attorney Carl E. Knochelmann Jr. Plaintiff was represented by Assistant U.S. Attorney Robert K. McBride. The parties have also filed post-hearing briefs (Docs. #21 & #22), and the motion is now ripe for review.

*I.     ISSUES*

Defendant's suppression motion raises two issues. First, Lawson seeks to suppress the heroin seized from her luggage as having been obtained in violation of her Fourth and Fourteenth Amendment rights. Second, she sought to suppress statements she made to police following the discovery of the heroin on the basis that they were obtained in violation of her Fifth, Sixth, and Fourteenth Amendment rights.

Defendant's latter challenge was adjudicated at the conclusion of the April 28, 2005, evidentiary hearing, when the Court found that Defendant knowingly and voluntarily waived

her *Miranda* rights, thereby rendering admissible any statements she made thereafter.  The Court's decision in this regard has been transcribed and filed of record. (Doc. #19) Therefore, only the first issue remains.

## II.   FACTS[1]

On February 24, 2005, Defendant Lawson, a United States citizen, was traveling from Lagos, Nigeria to Montgomery, Alabama.  Her 16-month-old son was traveling with her.  One of the flights in her travel route was Delta Airlines Flight No. 43, a direct flight from Paris, France to the Northern Kentucky-Greater Cincinnati International Airport (CVG).

Senior U.S. Customs Officer Heidi Tien was working the Passenger Analysis Unit (PAU) on February 24, 2005.  She testified that review of Flight No. 43's manifest was part of her job duties that day.  Her attention was drawn to Defendant's name, because her travel pattern was consistent with recent trends for Nigerian heroin trafficking.  Specifically, Tien testified she noted Lawson's path originated from Lagos, Nigeria; her reservations had been made just the day before; her ticket was purchased for $1,700 cash; and she was traveling on a passport whose first number was a "7", indicating the passport had been issued at a foreign embassy.  Tien explained that these travel circumstances were the same as those seen in two prior recent incidents at CVG involving attempted heroin smuggling from Nigeria.  Officer Tien also checked Defendant's travel history, then had faxed to her a November, 2004 customs declaration form for Defendant. (Plaintiff's Ex. 1) That form reflected a Nashville, Tennessee destination address that Tien testified had been

---

[1]The facts herein are based on the Court's review of the exhibits introduced during the April 28, 2005 evidentiary hearing and the testimony of the witnesses who were called to testify during the hearing.  The Court found each witness to be highly credible.

associated with heroin seizures since July of 2004. Officer Tien testified that given this information, she contacted U.S. Immigration & Customs Enforcement Agent Shawn Lichner to advise him of a potential heroin interdiction that afternoon.

Delta Flight No. 43 landed at CVG, and Lawson deplaned and proceeded to retrieve her checked luggage at the baggage carousel. Like the other passengers aboard the international flight, Lawson was routed to Customs Primary for an initial determination of lawful admission into the country by proper documentation. Once her passport was swiped at Customs Primary, agents were alerted based upon the prior PAU identification, and Lawson was then directed to Customs Secondary, where inspections are done to check for contraband.

As Lawson approached Customs Secondary, Customs Officer Michael Rogalcheck was waiting and had been alerted in advance of the details of her travel. Lawson was pushing a cart in which her son was seated and on which were three pieces of luggage. Officer Rogalcheck testified she approached him with her head down, without making eye contact. Lawson handed Officer Rogalcheck her passport and customs declaration form. (Plaintiff's Ex. 2) Rogalcheck testified he proceeded to question her about the information listed on her declaration form. In response to questions, she stated her husband had purchased the ticket for her two weeks earlier, and that she was headed to Alabama to visit her aunt. He asked if the three suitcases belonged to her and whether she had packed them; she answered yes. According to Officer Rogalcheck, during this encounter Lawson appeared nervous, avoided eye contact with him, and offered cryptic answers to his questions.

3

Officer Rogalcheck then proceeded to examine Lawson's suitcases.  Customs Officer Boyd was present assisting him, as was Officer Tien.  Each of the three suitcases had wheels and a retractable, pull-type handle in order to wheel the suitcase rather than having to carry it.  Lawson's smallest bag was examined first.  In inspecting the exterior of the bag, Rogalcheck noted the pull handle extended approximately six inches, which was not the full length of the bag.  At the hearing, Officer Tien testified that, given the length of the bag, she considered the fact that the handle would extend only six inches to be an anomaly.  Officer Rogalcheck testified he did not consider the handle's extension an anomaly so much as a modification.[2]  He further testified that part of his training included instruction to inspect further if any modifications were noted.

Officer Rogalcheck related he then proceeded to inspect the interior of the bag by removing the contents and unzipping the suitcase liner in order to access the skin of the bag. (Plaintiff's Ex. 3)  Upon doing so, he noted that a plastic piece at the bottom of the case was cracked and had been taped over, and that two of the four rivets had been replaced with other hardware.  He attempted to further examine this area by trying to remove the hardware with a multipurpose tool, but was unable to do so.

At this point Officer Rogalcheck decided to x-ray the bag.  Officer Tien explained during her testimony that the purpose of this particular type of x-ray machine is to depict the density of an object.  This is accomplished by displaying the x-rayed object upon a monitor in various shades of gray, with white representing objects with the greatest density and black depicting little or no density.  Both Officers Tien and Rogalcheck testified they

---

[2]Whether called an "anamoly" or "modification", the fact that the handle did not fully extend or retract was unusual and warranted further investigation.

4

have been trained on the use of this machine and how to interpret various objects based upon how the density is depicted.

Officer Rogalcheck ran the bag through the x-ray machine three times in order to view the case at different angles.  Rogalcheck testified that on x-ray he observed what appeared to be abnormal or atypical density in the rails of the luggage, with the top portion of the rails appearing darker and the bottom portion appearing lighter.  That is, what should have appeared on x-ray as a hollow black tube (indicating virtually no density) of sufficient length to sheath the full length of the pull-out handle, instead reflected white at the bottom portion of the tube, a density suggesting the tube was not hollow in that area.  That this tube was not hollow is also consistent with the observation that the handle appeared unusually short.

Officer Rogalcheck testified that upon observing this on x-ray, he sought to gain access to the inside rails of the suitcase.  They stood the bag upright in an effort to remove the handles and view down the rails, but were unsuccessful.  Then, with the skin of the bag exposed, Officer Rogalcheck proceeded to cut what he described as a three-inch slit in the inner lining in order to expose the rails. (Plaintiff's Ex. 3)  Officer Boyd then tapped on the rail and, according to Officer Rogalcheck, it was evident the rail was not hollow since the sound emitted with Officer Boyd's tapping was a "thunk" rather than a "ping."   Officer Rogalcheck testified that, at this point, he observed Lawson's carotid artery was pulsating, indicating she was nervous.  Officer Tien then retrieved a drill and, using a 3/8 inch drill bit, Officer Rogalcheck proceeded to drill a small hole in the one-inch wide rail of the suitcase. (Plaintiff's Ex. 4)  He testified at that point a white powder was exposed, which field-tested

5

positive for heroin.  They then proceeded to examine the remaining two bags, both of which demonstrated the same modification of the rails and also revealed heroin upon drilling.[3]

Lawson was subsequently placed under arrest, and the bags were seized and then photographed by DEA Agent Mary Neville. (Plaintiff's Exs. 6-12)  Lawson was advised of her *Miranda* rights by Agent Lichner, voluntarily waived her rights by signing a Statement of Rights and waiver form (Plaintiff's Ex. 5), and was then interviewed.  Lawson is charged with one count of importing heroin into the United States in violation of 21 U.S.C. § 952, and one count of conspiracy to import heroin into the United States in violation of 21 U.S.C. § 846.

### III.    ANALYSIS

#### A.    Border Searches Generally

"The Fourth Amendment commands that searches and seizures be reasonable." *United States v. Montoya de Hernandez,* 473 U.S. 531, 537 (1985).  "A search without a warrant is 'per se unreasonable under the Fourth Amendment subject only to a few specifically established and well-delineated exceptions.'" *United States v. Boumelhem,* 339 F.3d 414, 420 (6th Cir. 2003)(quoting *Katz v. United States,* 389 U.S. 347, 357 (1967)).  A search conducted by the government at the United States border has long been recognized as an exception to the Fourth Amendment's warrant requirement.  *Carroll v. United States,* 267 U.S. 132, 154 (1925).  At the border, "the Fourth Amendment balance between the interests of the Government and the privacy right of the individual is struck much more

---

[3]Defendant acknowledged at the evidentiary hearing that no separate and distinct challenge is raised to the search of the second and third suitcases, and so the Court's ruling as to the constitutionality of the search of the first suitcase applies equally to bags two and three.

favorably to the Government." *Montoya de Hernandez,* 473 U.S. at 540.  This is because of the "long-standing right of the sovereign to protect itself by stopping and examining persons and property crossing into this country," *United States v. Ramsey,* 431 U.S. 606, 616 (1977), and the "longstanding concern for the protection of the integrity of the border." *Montoya de Hernandez,* 473 U.S. at 538.

"The border search exception generally provides that routine searches of the persons and effects of entrants are not subject to any requirement of reasonable suspicion, probable cause, or warrant." *Boumelhem,* 339 F.3d at 420; *Montoya de Hernandez,* 473 U.S. at 538.  Border searches are reasonable simply by virtue of the fact that they occur at the border.  *Ramsey,* 431 U.S. at 616.  That is, they are reasonable within the meaning of the Fourth Amendment because of "the single fact that the person or item in question had entered into our country from the outside," and that "such broad powers have been necessary to prevent smuggling and to prevent prohibited articles from entry."  *Ramsey,* 431 U.S. at 619.  "This longstanding recognition that searches at our borders without probable cause and without a warrant are nonetheless "reasonable" has a history as old as the Fourth Amendment itself."  *Id.*

An airport receiving passengers from a nonstop flight outside of the United States is "the functional equivalent to a border."  *Almeida-Sanchez v. United States,* 413 U.S. 266, 273 (1973).  The parties herein do not dispute that Customs at CVG was the functional equivalent of a border for purposes of passengers arriving from Delta Flight No. 43.

Against the background of these governing general legal principles, Defendant nevertheless contends the custom officials' search of her luggage violated the Fourth Amendment.  Specifically, Lawson concedes Officer Rogalcheck had authority to conduct

7

a "routine" border search, but protests that the x-ray search of her luggage, then subsequent cutting of the lining and drilling of the suitcase rail were nonroutine and therefore required a particularized reasonable suspicion before conducting, which she claims was lacking under the facts of this case.

### B.    X-ray Inspection of the Luggage

Turning first to the x-ray of Lawson's suitcase, this was conducted after she was directed to Customs Secondary.  As discussed above, probable cause is not needed for customs officials to start a primary or secondary inspection.  *Montoya de Hernandez,* 473 U.S. at 537.  This includes personal baggage, which may be searched at the border without the slightest suspicion.   *Henderson v. United States,* 390 F.2d 805, 808 (9th Cir. 1967)(discussing standard of suspicion necessary as border search becomes progressively more intrusive, with examination of vehicle, luggage, contents of pockets or purse requiring no suspicion, versus a strip search or body cavity search requiring greater levels of suspicion).

Similarly, x-rays of an entrant's belongings would be part of routine border security permissibly conducted without any suspicion.  Defendant, however, disagrees.  Relying upon language from a footnote in *Montoya de Hernandez*, Lawson argues that involuntary x-ray searches are nonroutine and therefore require suspicion.  *Montoya de Hernandez,* 473 U.S. at 541 n.4 ("we suggest no view on what level of suspicion, if any, is required for nonroutine border searches such as strip, body cavity, or involuntary x-ray searches").

This argument is misplaced.  To the extent any suspicion may be required for an x-ray search because of the level of intrusiveness, the authorities Defendant relies upon focus upon an x-ray search of the *person,* not the person's *possessions*.  The personal

8

intrusiveness of an x-ray differs depending upon whether the object it is imposed upon is animate or inanimate.  Lawson suffered no personal indignity nor health risk by the x-ray exam of her bag.  Both Officer Tien and Officer Rogalcheck testified that x-ray of luggage is routine.  The x-ray of Lawson's bag was properly part of routine procedure undertaken at the border.  *See, e.g., United States v. Okafor,* 285 F.3d 842, 845-46 (9th Cir. 2002)("X-ray examination of luggage, bags, and other containers at a border is routine and requires neither warrant nor individualized suspicion."); *United States v. Johnson,* 991 F.2d 1287, 1293 (7th Cir. 1993)("No doubt thousands of airport users subject their luggage to the same [x-ray] procedure each day; the machine that was used to x-ray [defendant's] suitcase was the type that is used in airports across the country. [Defendant] could not have reasonably expected that her suitcase would pass through customs without being subjected to an x-ray examination."); *United States v. Strickland,* 1999 WL 33251455, at *3 (N.D. Ill.)(x-ray inspection of luggage was part of routine border search, where defendant made similar "involuntary x-ray search" argument, also relying upon footnote 4 of *Montoya de Hernandez*); *cf. United States v. Camacho,* 368 F.3d 1182, 1186 (9th Cir. 2004)(use of radioactive "Buster" device to check density of border vehicle's spare tire did not require reasonable suspicion).

Indeed, in the current climate of airline travel security, it is likely that suspicionless x-ray of checked baggage applies regardless of border circumstance, though this question is not presently before the Court.  However, the issue that is before this Court -- the x-ray of Lawson's suitcase upon her entry into this country -- implicated no Fourth Amendment concerns as to the reasonableness of the intrusion so as to require some level of suspicion

exist before x-ray inspection of this personal property.   The Government's x-ray of Lawson's luggage at Customs Secondary was therefore lawful.

### C.    Cutting and Drilling of the Luggage

In addition to the x-ray of her baggage, Lawson challenges the cutting of the skin of her bag and the drilling of the suitcase rail as being so intrusive and destructive as to be beyond routine border inspection and thereby requiring reasonable suspicion.   Defendant acknowledges that in the recent case of *United States v. Manuel Flores-Montano,* 541 U.S. 149 (2004) the Supreme Court held that border patrol's removal, disassembly, and reassembly of a vehicle's gas tank as part of a border inspection of property required no suspicion.   Lawson interprets *Manuel Flores-Montano* as creating a "vehicle" exception to "the reasonable suspicion standard of *United States v. Montoya de Hernandez"* (Doc. #21, p.5) and then, in a bit of twisted logic, suggests that because the inspection at issue was of a suitcase and not a vehicle, reasonable suspicion is required because the *Flores-Montano* vehicle exception does not apply.

First, the "reasonable suspicion" standard enunciated in *Montoya de Hernandez* was to effect "a needed balance between private and public interests when law enforcement officials must make a limited intrusion on less than probable cause."   *Montoya de Hernandez,* 473 U.S. at 542.   The "limited intrusion on less than probable cause" in *Montoya de Hernandez* was the *detention of the person* of defendant at the border until she had a bowel movement, which *detention* the Court found to be "beyond the scope of a routine customs search and inspection."   *Id.* at 541.   The Court footnoted that it was expressing "*no view* on what level of suspicion, *if any,* is required for nonroutine border searches such as strip, body cavity, or involuntary x-ray searches."   *Id.* n.4 (emphasis

10

added).   Thus, contrary to Lawson's reading, the Court does not interpret *Montoya de Hernandez* as imposing a "reasonable suspicion" standard in circumstances of all "nonroutine" border searches.

Moreover, the language of *Flores-Montano* suggests that viewing border searches as "routine" or "nonroutine" and thereby determinative of whether some level of suspicion is required for any inspection is an inappropriate emphasis upon what the Court intended to be merely descriptive terms. *Flores-Montano,* 541 U.S. at 152. After noting the Court's prior use of the terms "routine" and "nonroutine" in *Montoya de Hernandez,* the Court in *Flores-Montano* explained:

> But the reasons that might support a requirement of some level of suspicion in the case of highly intrusive searches of the person – dignity and privacy interests of the person being searched – simply do not carry over to vehicles. Complex balancing tests to determine what is a "routine" search of a vehicle, as opposed to a more "intrusive" search of a person, have no place in border searches of vehicles.

*Id.*  It seems clear to this Court that the threshold consideration is the level of intrusiveness of the search and that, generally, a search of a person will likely invoke intrusiveness considerations different and more significant than those of a search of the person's effects. This is consistent with longstanding precedent as to the parameters of searches considered reasonable and therefore not in violation of the Fourth Amendment because they occur at the border.

> It would be intolerable and unreasonable if a prohibition agent were authorized to stop every automobile on the chance of finding liquor and thus subject all persons lawfully using the highways to the inconvenience and indignity of such a search.  Travellers may be so stopped in crossing an international boundary because of national self protection reasonably requiring one entering the country to identify himself as entitled to come in, and his belongings as effects which may be lawfully brought in.  But those lawfully within the country . . . have a right to free passage without

11

interruption or search unless there is known to a competent official authorized to search, probable cause for believing that their vehicles are carrying contraband or illegal merchandise.

*United States v. Ramsey,* 431 U.S. at 618 (quoting *Carroll v. United States,* 267 U.S. 132, 153-54 (1925)).  The Supreme Court in *Flores-Montano* reaffirmed this longstanding history of suspicionless border inspections as explained in *Carroll.  Flores-Montano,* 541 U.S. at 153-54.

In *Montoya de Hernandez* the Court determined that detention of the person multiple hours pending a bowel movement went sufficiently beyond what one would typically expect in a border search and was of a sufficient level of intrusiveness of the person and their expectation of personal privacy as to require reasonable suspicion.  *Montoya de Hernandez,* 473 U.S. at 541.  Lawson argues she had an expectation of privacy and privacy interest in her luggage that gives rise to some level of suspicion prior to its search. The privacy interest herein is being asserted as to personal property, rather than to the person as in *Montoya de Hernandez.*  Moreover, a similar privacy interest argument was asserted and rejected by the Court in *Flores-Montano.*  There the Court noted that "[i]t is difficult to imagine how the search of a gas tank, which should be solely a repository for fuel, could be more of an invasion of privacy than the search of the automobile's passenger compartment." 541 U.S. at 154.  Such reasoning applies with equal force here.  Lawson fails to articulate how luggage is more personal than one's automobile, nor does she point out any courts that have so held.  Border searches of luggage, including x-ray searches, have long been recognized, as discussed above.  Moreover, logically it would seem that any privacy interest would be directed more to the entrant's possessions within the luggage, rather than the actual receptacle itself.

12

Lastly, Lawson points to the destructive manner in which the inspection of her bag was carried out.  In *Flores-Montano* a similar argument of significant deprivation of property interest was made but rejected by the Court, after noting that the interference with possessory interest, though not insignificant, was justified by the interest in protecting the borders.  Lawson points to the Court's statement that "some searches of property are so destructive as to require a different result [than that of a suspicionless inspection]," *id.* at 155-56, arguing the inspection of her luggage is such a search.  Lawson says that unlike the gas tank in *Flores-Montano,* there was "serious damage to, or destruction of" her property by cutting the lining and drilling into the rail.

In *United States v. Ramsey,* the Supreme Court suggested in a footnote that a border search carried out in a "particularly offensive manner" might be deemed "unreasonable," but left for another day what would constitute a "particularly offensive manner."  *Ramsey,* 431 U.S. 618 n.13.  To support her position herein, Lawson points to *United States v. Rivas,* 157 F.3d 364 (5th Cir. 1998) and *United States v. Robles,* 45 F.3d 1 (1st Cir. 1996) as supportive of the proposition that a border inspection of property by drilling into the property goes beyond a routine border search, so particularized reasonable suspicion was required before drilling could be done.  In *Rivas* the border patrol drilled into the metal frame of a trailer stopped at a checkpoint.  157 F.3d at 367.  In *Robles* agents drilled into a machine part.  45 F.3d at 5.

The analysis is not that straightforward, and the holding of these cases that drilling necessitated reasonable suspicion has been called into question since *Flores-Montano*.  In *Flores-Montano* the defendant also relied upon drilling cases, including *Rivas* and *Robles,* as evidence of a nonroutine search requiring reasonable suspicion.  The Supreme

13

Court, though, rejected the reliance upon these cases as misplaced, since no drilling was involved in the border inspection of defendant's gas tank. The Court commented in a footnote that

> [w]e have no reason at this time to pass on the reasonableness of drilling, but simply note the obvious factual difference that this case involves the procedure of removal, disassembly, and reassembly of a fuel tank, rather than potentially destructive drilling. We again leave open the question "whether, and under what circumstances, a border search might be deemed 'unreasonable' because of the particularly offensive manner in which it is carried out." *United States v. Ramsey,* 431 U.S. 606, 618, n. 13, 97 S.Ct. 1972, 52 L.Ed.2d 617 (1977).

*Flores-Montano,* 541 U.S. at 155 n.2. The Court did not view the removal, disassembly and reassembly of the gas tank as being particularly offensive and beyond what could be routinely expected to occur at the border such as to be unreasonable.

Thus, the Court has cast doubt upon the continued viability of these drilling decisions as constituting "nonroutine" border searches requiring reasonable suspicion. Rather, the footnote focuses upon the notion of whether the search was carried out in a "particularly offensive manner" such that it might be deemed "unreasonable." What constitutes such was left unanswered since 1977 in *Ramsey* and remains unanswered as noted in *Flores-Montano.*

What few decisions have been rendered since *Flores-Montano* have not focused upon whether the border inspection of the property was nonroutine. The focus instead has been on whether the search was unreasonable given the manner in which it was carried out and the nature and extent of the destruction of property. *E.g., United States v. Cortez-Rocha,* 394 F.3d 1115, 1119 (9th Cir. 2005)("although *Flores-Montano* indicates that the government's inherent authority to conduct border searches may be limited to searches

14

that are not unreasonably destructive, the search of a vehicle's spare tire [by cutting it open], which neither damages the vehicle nor decreases the safety or operation of the vehicle, is not so destructive as to be unreasonable"); *United States v. Myers,* 127 Fed. Appx. 251, 252-53 (9th Cir. 2005)(drilling of small hole into externally-mounted box located in bed of truck was not unreasonably destructive nor required reasonable suspicion, but part of a routine, non-destructive border search of the vehicle).

Similar reasoning applies herein.  Had the intrusion been limited to the cutting of the suitcase inner lining, whether reasonable suspicion was needed would be less in doubt. *See Strickland,* 1999 WL 33251455, at *4 (defendant subjected to no more than routine border inspection despite cut in lining of suitcase); *Okafor,* 285 F.3d at 846 (cutting of defendant's nylon bag could have been part of routine border search, depending on size of cut and whether bag permanently damaged).  But even adding the drilling of the rail to the analysis, the search of Lawson's bag was not carried out in a particularly offensive or destructive manner so as to be unreasonable.  The agents testified good faith efforts were made to use the least intrusive means to access the rails of the bag in order to inspect its contents.  The cut was to the innermost lining of the bag, which did not render the bag unuseable nor the cut even visible to the eye once the interior lining was zipped back in place.  The hole drilled in the rail was small, could easily be taped or covered over if necessary, and also did not interfere with the function of the luggage.  Nor is what was done by inspectors necessarily beyond what might be routinely expected to occur at the border in order to assure that the effects of a person, in this case luggage, did not contain contraband.

15

Thus, the Court does not find the manner of inspection here was conducted in a particularly offensive or destructive manner as to be unreasonable. However, given that the Supreme Court has not yet expounded upon particular examples of the parameters of personal property destruction considered a routine part of a border search, the Court alternatively concludes that if the manner of inspection by cutting the lining and drilling into the rail was so offensive as to require reasonable suspicion, it certainly existed in this particular case.

Reasonable suspicion in this context requires "a particularized and objective basis for suspecting the particular person of [smuggling contraband]." *Montoya de Hernandez,* 473 U.S. at 541. Such suspicion is based on specific facts which, taken together with rational inferences therefrom, reasonably warrant an intrusion. *Id.* at 542. In determining whether government agents possess a reasonable suspicion that criminal activity is occurring, the Supreme Court requires reviewing courts look to the "totality of the circumstances" of each case. *United States v. Arvizu,* 122 S. Ct. 744, 750 (2002).

In this case, agents' attention was drawn first by Lawson's travel arrangements. Her departure country had been recently linked with heroin drug trafficking. Her reservations had been made only the day before, her not insignificantly priced ticket paid for in cash. And she was traveling on a series 7 passport. All of this information was common to recent heroin smuggling through CVG. The totality of this information was sufficient to prompt further check of Lawson's recent past travel, which revealed a declaration form from a few months earlier which listed a Tennessee address agents were aware had also been connected with drug activity.

16

These initial suspicions based upon commonsense inferences were only heightened by Lawson's inconsistent response to questioning at Customs Secondary, when she indicated her husband had purchased the ticket for her two weeks earlier.  Lawson has not refuted any of these facts.  Also significant to the agents was that Lawson's demeanor and body language during the encounter – avoiding eye contact, cryptic answers, pulsating carotid artery, appearing nervous – confirmed her discomfort with the inspection.  Adding to all of these already existing facts was the officers' discovery that her suitcase appeared to have been tampered with, and her increased level of discomfort and nervousness as they attempted to first dismantle the frame and, when they were unable to do so, their subsequent x-ray of the bag.

The x-ray inspection of the bag which revealed atypical areas of density in the rails, and agents' knowledge and experience in the use of hidden spaces to smuggle drugs, support a commonsense inference that the rails contained something, likely narcotics, that Lawson sought to smuggle illegally into the United States.  That is, Officer Rogalcheck's suspicion was based upon objective facts and was a "commonsense conclusio[n] about human behavior upon which practical people – including government officials, are entitled to rely."  *Montoya de Hernandez,* 473 U.S. at 542 (internal quotations omitted).

All of these facts, none of which have been refuted by Lawson, provided requisite reasonable suspicion for officials to investigate further.  This further inspection and investigation confirmed suspicions that drugs were being concealed.  That a reasonable means to investigate further necessitated they cut the lining and drill into the rail does not serve to bar such investigation.  *Cf. United States v. Sarda-Villa,* 760 F.2d 1232, 1239 (11th Cir. 1985)("[O]nce the officers have the right to conduct a thorough search, they are entitled

17

to use reasonable means to effect that search.  As we have recently noted, '[o]therwise, a person could preclude inspection of a vessel's interior simply by covering over all entrances to the interior so that some damage to the vessel would be inevitable if officers attempted to conduct a full-scale search.'" quoting *United States v. Andreu,* 715 F.2d 1497, 1501 n.13 (11th Cir. 1983)).  Accordingly, reasonable suspicion existed to justify the minimally intrusive border search of the rails of Lawson's suitcase.

### D.    Post-arrest Statements

One final point deserves mention.  As noted above, the Court previously denied Lawson's request to suppress her post-arrest statements on the basis she knowingly and voluntarily waived her *Miranda* rights.  At the evidentiary hearing Lawson also challenged the use of these statements as being "fruit of the poisonous tree" necessitating suppression as a consequence of the alleged unlawful search of her bag.  As for this contention, any such argument is likewise rejected in light of the Court's conclusion herein that the search of Lawson's luggage did not violate her constitutional rights.

18

## IV.     CONCLUSION

For the reasons stated herein, **IT IS ORDERED** that:

(1)     Defendant's Motion to Suppress (Doc. #13) is hereby **denied;**

(2)     A **Status Conference** is hereby scheduled in this matter for **June 10, 2005 at 10:00 a.m.** at which time the Court will set a trial date in this matter; and,

(3)     The time period from April 7, 2005, through the date of this Order, totaling 60 days, is deemed **excludable time** pursuant to 18 U.S.C. § 3161(h)(1)(F).

This 6th day of June, 2005.



Signed By:

*David L. Bunning*

**United States District Judge**

G:\DATA\Opinions\2-05-cr-24-MTSuppress.wpd